## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **LATOYA WHITE**<br>**3525 Cornstream Road**<br>**Randallstown, MD 21133**<br><br>     *Plaintiff,*<br><br>**v.**<br><br>**UNIVERSITY OF MARYLAND**<br>**MEDICAL CENTER**<br>**22 S. Greene Street**<br>**Baltimore, MD 21201**<br><br>     *Defendant.*<br><br>**Serve:**<br><br>**Allan G. Carey**<br>**250 West Pratt Street**<br>**24ᵗʰ Floor**<br>**Baltimore, MD 21201**<br><br>**Kathryn M. Widmayer, Esq.**<br>**University of Maryland Medical System**<br>**110 S. Paca Street**<br>**PP-2S-156**<br>**Baltimore, MD 21201** | **Case No.:** *22-671*<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Latoya White, (hereinafter "Plaintiff") by and through undersigned counsel, and complains against Defendant, University of Maryland Medical Center, (hereinafter "Defendant" or "UMMC") and in support thereof states as follows:

## INTRODUCTION

1.     This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), the Pregnancy Discrimination Act of 1978, the

1

American with Disabilities Act of 2008, 42 U.S.C. § 12101 *et seq*. ("ADA"), Maryland's Fair

Employment Practices Act, Md. Code Ann., State Gov't, § 20-601 *et seq*. ("FEPA"), and

Maryland's Wage Payment and Collection Law, Md. Code, Lab. & Empl. Art., §§3-501 – 3-509

("MWCPL"), for the Defendant's unlawful harassment, discrimination based on race (African

American), gender (female), disability (pregnancy and Covid-19), retaliation, hostile work

environment, and wage theft against Plaintiff, including, but not limited to, Defendant's

discriminatory treatment towards Plaintiff, denying opportunities and reasonable

accommodations as part of a larger toxic working environment.

## JURISDICTION AND VENUE

2.      This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C.

§ 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United

States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et

seq*., and the Americans with Disabilities Act, to redress and enjoin employment practices of the

Defendant.

3.      Venue is appropriate because a substantial part of the actions complained of are the result

of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

4.      Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §

1391(b) because a substantial part of the wrongful conduct complained of herein occurred in the

District, Defendant transacts substantial business in this District, and Defendant maintains

employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

5.      Plaintiff has exhausted all of her administrative remedies.

6.      Plaintiff filed a complaint with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission (EEOC) and the Maryland Commission on Civil Rights on December 20, 2021, alleging discrimination on the basis of race (African American), sex (female), disability (pregnancy and Covid-19), and retaliation.

7.      A Right-to-Sue letter was issued to Plaintiff from the EEOC on December 22, 2021, which Plaintiff received on December 23, 2021.

8.      Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## **NATURE OF THE ACTION**

9.      Plaintiff brings this action to secure protection of the rights granted under the statutes mentioned above, to redress deprivation of her rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

10.     Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, unpaid wages, emotional tranquility, and denial of her constitutional and statutory rights.

11.     The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## **PARTIES**

12.     Plaintiff, Latoya White, formerly known as Latoya Jones, is an African American female domiciled in Randallstown, Maryland.

3

13.     Defendant is the flagship academic medical center at the heart of the University of Maryland Medical System ("UMMS"), with multiple locations throughout Baltimore, Maryland.

14.     The UMMC provides a full range of health care services, coordinated across its downtown and midtown Baltimore hospital campuses and several community locations.[1] The UMMC includes over 10,500 employees and its medical staff comprises nearly 1,200 attending physicians who are faculty members at the University of Maryland School of Medicine, as well as 900 residents and fellows in all medical specialties.

15.     Defendant, University of Maryland Medical Center, promotes itself as being both "committed to… [t]raining the next generation of health professionals" and "to honesty, fairness, sincerity and ethical behavior in all of our interactions, starting with how we treat each other."[2]

16.     During the relevant period, Defendant employed Plaintiff, Latoya White as an employee in a part-time capacity.

17.     During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII and the aforementioned statutes.

## FACTUAL ALLEGATIONS

18.     Plaintiff, Latoya White, has been employed by Defendant, the University of Maryland Medical Center since January 27, 2020. When she was hired, she was the only Black Nurse Practitioner in her entire department.

---

[1] https://www.umms.org/ummc/-/media/files/umms/about-us/member-hospitals/fact-sheets/ummc-fact-sheet-2020.pdf?upd=20201229173508
[2] https://www.umms.org/ummc/about/mission-vision

19.     On April 9, 2020, Ms. White emailed her manager Kellie Deal (White, female) regarding personal leave being unlawfully taken from her, which should have been covered under a UMMC policy. Ms. Deal ignored her email entirely.

20.     Again, Ms. White emailed Ms. Deal on June 1, 2020, and this time attached the policy. Ms. Deal again did not respond to this correspondence, either.

21.     Finally, two and a half months after Ms. White sent her initial email to Ms. Deal, her leave was inexplicably restored. This was the pivotal moment when Ms. Deal began using her emails as a means to harass, bully, and otherwise belittle Ms. White.

22.     On April 17, 2020, Ms. White emailed Deborah Schofield (White, female) about working the TRI Support Center at the Lord Baltimore Hotel ("LBT") for additional shifts. Ms. Schofield advised Ms. White to check with Ms. Deal for approval, which she did but received no response.

23.     On April 19, 2020, two days after Ms. White's made her request to work additional shifts, she was confronted by co-worker Beth Waddell (White, female) about her working remotely. Although Ms. Waddell's job lacked any supervisory responsibilities or any authority over Ms. White, she demanded that Ms. White return to work at the hospital in-person, in order to conduct a phone chart review. It appeared that Ms. Waddell was following the lead of Ms. Deal in harassing Ms. White without justification.  Considering Ms. White was never given any formal notification from her manager, Ms. Deal, indicating that her work schedule was or needed to be changed from the schedule she had, it was particularly confusing as to why Ms. Waddell was approaching her in such a manner.

24.     On or around this same time, Ms. Deal sent an email to her employees assigning all of them, except Ms. White, to phone charts. When Ms. White reached out to her about not receiving an assignment, Ms. Deal responded by stating that she did not want Ms. White to work the

phones until six (6) months after her hire date. This unilateral change in the terms and conditions of Ms. White's employment was not discussed, nor consistent with the employment terms and conditions of similarly-situated non-Black employees.

25.     On April 24, 2020, Ms. Schofield again refused to approve Plaintiff's request and ability to work with the TRI Support Center, and directed her to check with Ms. Deal for additional approval. Randomly, and prior to Plaintiff's ability to connect with Ms. Deal, Ms. Schofield emailed Ms. White that they were not paying bonus shift rates at the TRI Support Center, and were only offering regular shift rates as of April 28, 2020. Ms. White soon realized that this was seemingly a means to deter Ms. White from pursuing this opportunity further.

26.     In response, Ms. White contacted Medical Director, Dr. Kevin Burns (White, male) and Lead Clinical Physician for the TRI Support Center to inquire about the veracity about the information she received from Ms. Schofield. Dr. Burns advised Ms. White that he would look into this, but affirmed to her that anyone working on this project would be paid at bonus shift rates, since the money was allocated from the State of Maryland.

27.     On May 8, 2020, however, Dr. Burns was reportedly told that Ms. White was not eligible to be paid for bonus rates because she was a part-time employee.

28.     Ironically, this "policy" was not enforced against Ms. White's colleague, Roseann Val (White, female). Ms. Val, despite being part-time, and under Ms. Deal's supervision, was allowed to work at the TRI Support Center in the LBT *and* receive the bonus rate compensation, an opportunity that Ms. White was being denied of. UMMC's denial of Ms. White's opportunity to work at LBT, while simultaneously granting this opportunity to a White part-time employee, was a clear instance of disparate treatment on the basis of race.

29.     Following this pattern of treatment, in May 2020, Ms. White started noticing that she was being excluded from group emails. Specifically, she was made aware that her own supervisor had the recurring practice of intentionally excluding her from group recognition emails. Based on reason and belief, Ms. Deal intentionally did this in order to prevent Ms. White from building relationships with her peers, by causing her to appear rude and standoffish amongst her colleagues.

30.     It began to appear that Ms. White was now being retaliated against for contacting Dr. Burns after she was denied an equitable work opportunity.

31.     Then, on August 28, 2020, Ms. White was advised that she could not work weekends because she was only a part-time employee. This prohibitive policy seemingly did not apply to her comparator Ms. Val, however, as she was approved for weekend work, further evidencing the disparate treatment that Ms. White was being subjected to.

32.     In the Winter of 2020, Ms. White discovered that she was pregnant. On February 26, 2021, Ms. Deal emailed Ms. White regarding her upcoming medical appointment and asserted that there would be several changes in the conditions of her employment. Ms. Deal was now requiring Ms. White to sign in and out of work with group members, and to schedule her medical appointments for the days that she is not scheduled to work—which are policies that were not implemented for anyone else. In response, Ms. White asserted that Ms. Deal allows Carol Brokos (White, female) to advise management in advance of her medical appointments without issue, yet she was not being permitted to. Similarly, Ms. White's colleagues Megan Brady (White, female, pregnant) and Joyce Gunn (White, female) were permitted to attend medical appointments during their scheduled work hours, without incident.

7

*Peer Review and Performance Evaluation*

33.     On March 10, 2021, Ms. Waddell created a peer review of Ms. White, which was supposedly based on her work with Ms. White from April 2020. The review however, included false accusations and comments, which presented in a racially charged language manner. In her review, Ms. Waddell essentially accused Ms. White of being "lazy," after only working with her for one weekend in April 2020, which almost 12-months prior to the time of her review.

34.     Ms. Waddell further opined, that in her (non-managerial) opinion, Ms. White has issues in demonstrating her knowledge – despite Ms. White's job requiring her to work on the Covid Hotline, where there were no metrics to accurately access one's development. In short, Ms. Waddell either drafted this peer review after working with Ms. White on a few rare occasions almost a year before, or Ms. Waddell mistook Ms. White with another Black employee who she had worked with recently.

35.     Unbeknownst to Ms. White, Ms. Waddell's inaccurate peer review would be used in the performance evaluation that Ms. White received from Ms. Deal in March 2021, despite it reflecting very few instances of work between Ms. White and Ms. Waddle, most of which occurred eleven months earlier. Ms. Deal used this peer evaluation to create a false dichotomy between Nurse Practitioners ("NP") and Registered Nurses ("RN") although the RN role was fluid, and no written duties for the position were ever provided.

36.     Also in this performance review, Ms. White began being reprimanded for leaving virtual staff meetings at times when they deteriorated into staff members bickering amongst one another, with no control by management. In one such instance cited by Ms. Deal, Ms. White was chastised for leaving a virtual meeting after thirty (30) minutes of staff bickering, once some of her colleagues began using offensive language that was both judgmental and classist.

37.     Next, Ms. Deal docked Ms. White for a lack of participation in "quality improvement projects," although mandatory participation in these projects was never communicated to Ms. White as a new employee. Yet, Ms. White was now being held accountable for expectations of her supervisor that she never knew existed.

38.     This peer review and employee evaluation show concerted action by UMMC employees to target Ms. White due to her race, gender, and in retaliation for speaking out against previous instances of disparate treatment at Defendant's workplace.

39.     After receiving this evaluation, Ms. White notified Ms. Remson, her Human Resources Representative, that she felt like she was the target of a hostile work environment and workplace discrimination. Within days, Ms. Deal, in a clear act of reprisal, summarily placed Ms. White on a Peer Improvement Plan ("PIP") that she still refuses to explain the reasons for. After this, Ms. Remson seemingly teamed up with Ms. Deal and the two of them would subsequently work in tandem to bully, harass, and demean Ms. White.

40.     Additionally, since the PIP meetings Ms. White was required to attend with her supervisor were set on Ms. White's off days, she was forced to meet and unlawfully perform work tasks without compensation.

41.     On April 1, 2021, Ms. Remson advised Ms. White that Performance Evaluations are not appealable and questioned why Ms. White felt she was denied an opportunity. Ms. White explained how she was prevented from working at the Lord Baltimore Hotel for various fraudulent reasons, and only given an opportunity after Dr. Burns stepped in. Then, a year later, a peer review from an employee who has benefited from the racial hierarchy at UMMC, was suddenly authored about an experience eleven months prior, eventually becoming the basis for a PIP and Performance Evaluation.

42.     Ms. White rebutted the inaccuracies included in the peer review and the performance evaluation and submitted it to Human Resources on May 22, 2021. No one followed up with Ms. White as to her rebuttal or the fears she expressed to Human Resources about her work environment.

*Pregnancy Accommodations*

43.     Shortly after receiving and rebutting her Performance Evaluation, Ms. White began to unfortunately experience pregnancy complications.

44.     On June 17, 2021, her OBGYN recommended that she continue to telework due to the ongoing complications.

45.     Although this same job was done competently by Ms. White and most of her colleagues via telework for much of the past year, on June 29, 2021, Ms. Remson denied her reasonable accommodation without engaging in the interactive process. Meanwhile, around this time, Plaintiff's colleague, Ms. Brokos, (White, female, not pregnant) began to receive a medical accommodation that, upon information and belief, allowed her to work remotely for over seven (7) months and has remained active as of the date of this Complaint.

46.     When Ms. White insisted that her insurance required specific language regarding the denial of accommodations, Ms. Remson gave her the runaround before sending her a letter on July 14, 2021, which was fraudulently backdated to June 21, 2021. She advised Ms. White to sign this document with a fraudulent date, even though Ms. White was entitled to this letter as soon as UMMC began to explore options for her accommodations which was weeks prior.

47.     The constant stress of Ms. Deal, Ms. Remson, and the disparate treatment at her workplace, contributed to Ms. White delivering her child premature just four days later on July 18, 2021.

48.     On October 13, 2021, Ms. White emailed Ms. Deal regarding her need for an additional week of leave. She was advised to contact Ms. Remson. Ms. White contacted Ms. Remson and was re-directed to seek approval from Lincoln Financial for short-term disability coverage. Ms. White followed this direction and received approval for leave on October 15th.

49.     The next day, Ms. Deal emailed Ms. White that her one-week extension would count as an occurrence, which seemed to be the direct result of Ms. White being denied reasonable accommodations during her pregnancy.

50.     Further, Ms. White's leave had not been reduced in the twenty-four-period following Ms. Deal's direction to seek approval from Lincoln, which resulted in Ms. White seeking leave, only to reverse course the next day.

*Return from Maternity Leave*

51.     Ms. White returned from maternity leave on November 2, 2021.

52.     Upon her arrival, Ms. White overheard employees talking about a practice change that was implemented over a month ago, but she was given no guidance about any internal policy or practice changes.

53.     Regarding one of the departmental changes, a colleague sent Ms. White an email which she had been left off from again. While discussing this email with her supervisor, Ms. White again asked if there were any other changes, reminding her supervisor that this was her first day back from leave.

54.     In response, Ms. Deal directed her to check her emails, knowing that this would not sufficiently inform Ms. White of anything, as Ms. Deal made it a pattern of neglecting to send or include Ms. White in staff emails, or otherwise intentionally removed her from emails directed to the entire department.

55.     Over email, Ms. White pleaded with her supervisor for any assistance and advised her of the stress and lack of inclusion that she was feeling upon her return to work. As an example, she specifically asked about a policy change that a colleague had briefed her of regarding clocking in and clocking out. Ms. Deal stopped responding, and one week later, emailed Ms. White that an administrator would be inputting the change so that she would not have to clock-in and out going forward. In other words, instead of acknowledging that a policy change had occurred, Ms. Deal was content with Ms. White performing additional unnecessary requirements. Ms. Deal also refused to show her the process of how to request PTO, directing her to gain understanding from co-workers, who themselves were not supervisors.

*Covid-19 Accommodations*

56.     The week of the Thanksgiving holiday, Ms. Deal sent a message notifying the department (except Ms. White) that she was experiencing Covid and flu symptoms and would need to work from home. Ms. Deal was granted the same accommodations of telework that Ms. White was denied during her pregnancy the month prior.

57.     On December 6, 2021, Ms. White messaged her entire team, including Ms. Deal, that she was experiencing Covid symptoms and would be unable to make it in to work the following day.

58.     Nevertheless, on December 7, 2021, Ms. Deal texted Ms. White about coming in to work. Ms. White confirmed that she was still symptomatic and requested an accommodation of telework. Again, Ms. Deal denied Ms. White's request for a reasonable accommodation.

59.     When Ms. White brought up this inconsistency of treatment, she was chastised by Ms. Deal. The clear implication was that she should be grateful for what she received.

60.     One week later, on December 13, 2021, Ms. Deal sent an email to the team that telework would no longer be permitted. This was done intentionally to target Ms. White who, without

12

leave and now no longer able to work remotely, would be on unpaid leave should anything happen considering remote work was no longer an option.

61.     On December 20, 2021, Ms. White advised Ms. Remson and Ms. Deal that her husband tested positive for Covid and that she was going to get tested. In response, she was reminded that she would not be paid due to her lack of leave. She again requested the accommodation of telework, establishing that she was ready and able to do so, once approved. The following day Ms. White tested positive for the Covid-19 virus and diligently notified Human Resources and her supervisor.

62.     On December 24, 2021, Ms. White formally requested reasonable accommodations again for telework, stating that she was physically unable to come in and that she was contagious due to contracting Covid. Ms. Remson advised that she would check to see if they were able to accommodate this request. One week passed, without any response. Ms. White followed up with Ms. Remson via email. No one responded or updated Ms. White on her request, which forced her to use her short-term disability, which provided her with significantly less income than her full salary.

63.     When Ms. White returned to work in January 2022, the humiliation and bullying continued until she was forced to sit in a separate office, just to avoid the hostility of her work environment.

64.     On January 18, 2022, when Ms. White asked Ms. Deal for documents related to a patient's visit from earlier that day, her attempts to do her job were again frustrated. Ms. Deal first rebuked that it was not her responsibility to maintain such documents. When Ms. White stated that she was solely seeking to provide the patient with quality care, Ms. Deal stated she

deleted the documents, thereby confirming that they were in her possession and that she would not be providing them to Plaintiff.

65.     On January 26, 2022, while Ms. White was seeing a patient, she was interrupted by a co-worker advising her that Ms. Deal needed to speak with her, despite being told Ms. White was with a patient. Nonetheless, Ms. Deal confronted Ms. White, in front of the patient, and began discussing why Ms. White could not have a meeting with HR and Ms. Deal earlier in the day. As Ms. White had indicated in her email, she re-advised Ms. Deal that she had patients throughout the morning, and her one availability slot was taken up because one of Ms. White's clients arrived more than forty-five minutes late. Ms. Deal continued to berate Ms. White until the patient, who was onlooking, threatened to file a complaint.

66.     Later that morning, at approximately 9:45am, Ms. Deal texted Ms. White that HR would call at 1:30pm. Ms. White replied that she would see if one of her co-workers would be willing to see her 1:00pm patient so that she could accommodate the meeting. Ms. Deal vetoed this option and demanded that Ms. White pick up an additional patient at 2:00pm.

67.     Minutes later, Ms. White indicated that her 11:15am patient re-scheduled and she emailed HR and Ms. Deal asking if they could move the meeting up, to avoid any switches in schedule as she was unable to find any co-worker willing to switch with her.

68.     Ms. Deal indicated at 10:17am that HR could only do 1:30pm, which Ms. White later learned was untrue, because minutes earlier, HR had already communicated their availability as any time before 1:45pm.

69.     Finally, on February 2, 2022, Ms. Deal emailed Ms. White again requesting that she complete work-related tasks, without compensation, on her off day. Ms. White offered to meet that day instead, as she was working, but Ms. Deal declined.

14

70.    Due to this malfeasance and misconduct at the hands of her colleagues and superiors, Plaintiff has become fearful of her work environment.

71.    Plaintiff has consistently become the target of a pattern of race, gender, pregnancy,  and disability- based discrimination, further adding to a hostile work environment.

72.    Plaintiff is now forced to file suit due to the Defendant's inability to acknowledge and remedy their unlawful conduct, ultimately costing Plaintiff significant financial strain as well as emotional distress.

## COUNT I

## VIOLATION OF TITLE VII – RACE DISCRIMINATION

73.    Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

74.    A *prima facie* case of race discrimination under Title VII requires a showing of four (4) elements: (1.) she is a member of a protected class; (2.) she was qualified for the position; (3.) she suffered an adverse employment action; and (4.) the action occurred under circumstances giving rise to an inference of discrimination.

75.    Plaintiff, as an African American female, is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964.

76.    Plaintiff is a qualified Nurse Practitioner for which she has both the educational requirements as well as professional experience to competently perform her job.

77.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she was denied the opportunity to work at the LBT while White employees were allowed to work at LBT and received bonus- compensation.

78.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when as the sole Black female in her position, the terms of her employment were unilaterally changed so that she was required to work in person while non-Black employees continued to telework.

79.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when Ms. White was prevented from working the phones for her first six (6) months of employment, a condition not in place for any non-Black employees.

80.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when Ms. White was prevented in August 2020, from working weekends, a condition not in place for any non-Black employees.

81.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when in February 2021, Ms. White was prevented from scheduling medical visits relating to her pregnancy on days that she worked, a condition not in place for any non-Black employees.

82.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she received a poor Performance Evaluation based on: 1.) fictious allegations in a racially-charged peer review filed by her co-worker Ms. Waddell (White, female) calling her "lazy" and implying she was unable to learn, after working with her during one weekend, almost a year earlier; 2.) Ms. White leaving a virtual staff meeting "early" after thirty (30) minutes of uninterrupted staff bickering where colleagues used offensive and classist language; and 3.) Ms. White's alleged

lack of participation in quality improvement projects, despite no one advising her of this employment requirement during her onboarding, and being told none were available.

83.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when on multiple occasions Ms. White was denied reasonable accommodations that had been offered and were simultaneously being offered to non-Black employees.

84.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when on multiple occasions Defendants intentionally failed to keep Ms. White abreast of policy changes, procedures, and expectations that directly impacted her, but later disciplined Plaintiff for not being compliant.

85.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when Ms. White notified Ms. Remson that she was the target of workplace discrimination and a hostile working environment and within days Ms. Deal summarily placed Ms. White on a Peer Improvement Plan ("PIP").

86.     Because of her race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

87.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

88.     Defendant knew that Plaintiff was Black/African American prior to taking the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her race.

17

89.     Other similarly- situated non-Hispanic White employees such as Roseann Val, Carol Brokos, Joyce Gunn, and Megan Brady have been treated more favorably than Plaintiff with regards to the terms and conditions of employment and workplace conditions.

90.     Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

91.     Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

92.     The difference in treatment sufficiently demonstrates that the adverse employment action received by Plaintiff gives an inference of race discrimination and prejudice.

93.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

94.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

95.     Defendant discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

96.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment.

97.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, unpaid wages, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

98.     Plaintiff has suffered significant emotional, physical, and financial distress as a result of the unlawful actions and conduct of Defendant.

99.     Further, Defendant's discriminatory treatment and actions are ongoing.

100.    University of Maryland Medical Center is required to comply with Title VII, but by and through their conduct, have violated the statute.

## COUNT II

## VIOLATION OF TITLE VII – SEX DISCRIMINATION

101.    Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

102.    A *prima facie* case of sex discrimination requires a showing of four (4) elements: (1.) she is a member of a protected class; (2.) she was qualified for the position; (3.) she suffered an adverse employment action; and (4.) the action occurred under circumstances giving rise to an inference of discrimination.

103.    Plaintiff, as a Black/African American female, is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964.

104.    Plaintiff is a qualified Nurse Practitioner for which she has both the educational requirements as well as professional experience to competently perform her job.

105.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she was denied the opportunity to work at the LBT while White employees were allowed to work at LBT and receive bonus- compensation.

106.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when as

the sole Black female in her position, the terms of her employment were unilaterally changed so that she was required to work in person while her non-Black co-workers continued to telework.

107.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when Ms. White was prevented from working the phones for her first six (6) months of employment, a condition not in place for any non-Black employees.

108.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when Ms. White was prevented in August 2020, from working weekends, a condition not in place for any non-Black employees.

109.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when in February 2021, Ms. White was prevented from scheduling medical visits relating to her pregnancy on days that she worked, a condition not in place for any non-Black employees.

110.     Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she received a poor Performance Evaluation based on: 1.) fictious allegations in a racially-charged peer review filed by her co-worker Ms. Waddell (White, female) calling her "lazy" and implying she was unable to learn, after working with her during one weekend, almost a year earlier; 2.) Ms. White leaving a virtual staff meeting "early" after thirty (30) minutes of uninterrupted staff bickering where colleagues used classist language; and 3.) Ms. White's alleged lack of participation in quality improvement projects, despite no one advising her of this employment requirement during her onboarding, or any opportunities being available to her.

111.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when on multiple occasions Ms. White was denied reasonable accommodations that had been offered and were simultaneously being offered to other employees who were not female.

112.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when on multiple occasions Defendants intentionally failed to keep Ms. White abreast of policy changes, procedures, and expectations that directly impacted her, but later disciplined for not being compliant.

113.    Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when Ms. White notified Ms. Remson that she was the target of workplace discrimination and a hostile working environment and within days Ms. Deal summarily placed Ms. White on a Peer Improvement Plan ("PIP").

114.    Plaintiff has been subjected to unlawful conduct, adverse actions and different terms and conditions of her employment, all due to her sex – in violation of Title VII.

115.    Defendant knew that Plaintiff was a woman prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her sex.

116.    Other employees who were similarly situated, but were not female, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

117.    Plaintiff's sex was a determining factor in Defendant's unlawful conduct toward Plaintiff.

118.    Plaintiff's sex was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

119.    The difference in treatment sufficiently demonstrates that the adverse employment action received by Plaintiff gives an inference of sex discrimination and prejudice.

120.    Plaintiff has suffered significant emotional, physical, and financial distress as a result of the unlawful actions and conduct of Defendant.

121.    The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

122.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment.

123.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

124.    Further, Defendant's discriminatory treatment and actions are ongoing.

125.    Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

126.    UMMC is required to comply with Title VII, but by and through their conduct, have violated the statute.

## COUNT III

### HOSTILE WORK ENVIRONMENT AS A RESULT OF RACE AND SEX DISCRIMINATION

127.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

128.     To establish a claim of hostile work environment based on unlawful discrimination, Plaintiff must prove the following four elements: (1.) she belongs to a statutorily protected class; (2.) she was subjected to harassment in the form of unwelcome verbal or physical conduct; (3.) the harassment complained of was based on her statutorily protected class; (4.) the harassment affected a term or condition of employment[3] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No. 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

129.     Here, the five (5) elements of a *prima facie* case of a hostile work environment are met. Plaintiff belongs to statutorily protected classes as an African American and a woman.  Plaintiff was subjected to harassment in the form of 1.) being denied opportunities for bonus compensation; 2.) Ms. Deal bullying Plaintiff by habitually removing or otherwise not sending her emails that were sent to the rest of the team; 3.) Ms. Deal unilaterally changing the conditions of Plaintiff's employment on multiple occasions (requiring Plaintiff to come into

---

[3] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

work when similarly-situated employees continued to work remotely and using an employee

with no- supervisory power to advise Plaintiff of the change instead of notifying Plaintiff herself;

4.) requiring Plaintiff to participate in PIP meetings on her off-days for no compensation); 5.)

Ms. Remson, gaslighting Plaintiff and casting doubt as to why she would feel like she was being

targeted; 6.) reprimanding Plaintiff for minor offenses such as leaving virtual staff meetings that

had dissolved into inappropriate bickering when no other employees received consequences for

this behavior; 7.) denying Plaintiff of reasonable accommodations as she suffered from

pregnancy complications and Covid-19 forcing her to take short term disability and on another

occasion suffer a disciplinary infraction; 8.) management intentionally failing to advise Plaintiff

of changes in policies directly impacting her that occurred while she was on leave, then, allowing

Plaintiff to continue to do additional unnecessary labor while refusing to introduce her to the new

PTO system; 9.) Ms. Deal refusing to provide Plaintiff with documents to treat a patient, and

then deleting them in between Plaintiff's first and second request of the documents; 10.) Plaintiff

frequently being assigned a disproportional amount of work; and 11.) Ms. Deal confronting

Plaintiff in front of a patient over scheduling a meeting and continuing to berate Plaintiff over the

phone until the patient threatened to file a complaint.

130.    Plaintiff suffered adverse employment action directly related to her position of being a

protected class member as recognized under Title VII of the Civil Rights Act of 1964.

131.    Several terms and conditions of Plaintiff's employment were severely negatively

impacted by Ms. Deal's, Ms. Remson's, Ms. Schofield's and Ms. Waddell's conduct. There is a

basis for imputing liability, where the aforementioned managers/ employees UMMC, acting on

Defendant's behalf, and subjected the Plaintiff to the above-mentioned harassment, because of

her statutorily protected class as an African American woman.

132.    The actions and conduct of the Defendant as set forth herein created a hostile, offensive, and intimidating work environment that detrimentally affected Plaintiff to the point of requiring mental health treatment to cope with the constant hostility she faced on an almost daily basis.

133.    The actions and conduct by the Defendant as set forth herein were severe, hostile, and pervasive and constituted discrimination based on sex and race.

134.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same sex and race in Plaintiff's position.

135.    Defendant knew or should have known of the hostile work environment described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop the hostile work environment.

136.    By failing to protect Plaintiff within the Department; and by allowing for White employees, such as Roseann Val, Carol Brokos, Joyce Gunn, and Megan Brady to receive more favorable treatment than Plaintiff in the terms and conditions of her employment, Defendant exacerbated the hostile work environment suffered by Plaintiff, and intentionally discriminated against Plaintiff in violation of Title VII.

137.    Defendant's actions, and failure to act, amounted to discrimination based on race and sex under Title VII.

138.    Defendant's actions are part of a larger toxic workplace culture where Black female employees are not valued and often invisible in their own departments.

139.    As a direct result of Defendant's above-mentioned unlawful acts, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

140.     The above conduct was enabled and encouraged by Defendant and was imputable on a factual basis to Defendant, thereby creating an abusive, hostile environment for Plaintiff that made it difficult for her to perform essential functions.

141.     Defendant's inability to cease the above conduct and remedy the effects of this unlawful personnel action further demonstrates their contribution to the hostile work environment experienced by Plaintiff.

142.     Plaintiff has suffered irreparable harm, both professionally and personally, as a result of this unlawful conduct.

## COUNT IV

### VIOLATION OF AMERICANS WITH DISABILITIES
### ACT ("ADA") – (PREGNANCY)

143.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

144.     The ADA prohibits discrimination based on disability. *See* 42 U.S.C. § 12101 *et seq*. The ADA requires that covered employers to provide reasonable accommodations to employees with disabilities.

145.     On June 17, 2021, Ms. White's OBGYN recommended that she telework due to pregnancy complications and her increasing stress. Defendant was aware of her pregnancy complications and her new disability status as Plaintiff immediately requested from Defendant a reasonable accommodation of telework.

146.     Defendant failed to provide reasonable accommodations to Plaintiff and failed to engage in the interactive process, when they denied her telework, and required her to use short-term disability leave.

147.     Additionally, Defendant failed to provide reasonable accommodations to Plaintiff when they subjected her to different clock-in/ clock-out requirements than non-pregnant employees.

148.     Defendant has no genuine basis to deny this reasonable accommodation as Plaintiff and the entire department performed their jobs via telework for most of the past year due to the Covid-19 pandemic. Further, Ms. Brokos (White, female, pregnant) has had the reasonable accommodation of telework due to pregnancy during this same period of time.

149.     This denial of a reasonable accommodation directly led to Plaintiff receiving and/or being threatened with disciplinary action known as an occurrence due to her request for an additional week to recover before returning to work.

150.     Defendant used this new disability status to harass, demean, degrade, and humiliate the Plaintiff.

151.     The Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

**COUNT V**

**VIOLATION OF AMERICAN WITH DISABILITIES
ACT ("ADA") – (COVID-19)**

152.     The ADA prohibits discrimination based on disability. *See* 42 U.S.C. § 12101 *et seq*. The ADA requires that covered employers to provide reasonable accommodations to employees with disabilities.

153.     On December 6, 2021, Ms. White messaged her entire team, including Ms. Deal, that she was experiencing Covid symptoms and would be unable to make it in the following day. On December 7, 2021, Ms. Deal texted Ms. White about coming in. Ms. White confirmed that she was still symptomatic and requested an accommodation of telework. Defendant again denied

Plaintiff's request for a reasonable accommodation of telework, despite Ms. White's supervisor being granted the same reasonable accommodation after experiencing flu- like symptoms that apparently occurred the week of the Thanksgiving holiday.

154.    On December 20, 2021, Ms. White advised Ms. Remson and Ms. Deal that her husband tested positive for Covid and that she was going to get tested. She was reminded that she would not be paid due to her lack of leave. She again requested the accommodation of telework, establishing that she was ready and able to do so, once approved. The following day Ms. White tested positive for the Covid-19 virus and diligently notified human resources and her supervisor.

155.    Defendant failed to provide reasonable accommodations to Plaintiff when they denied her telework, both when she began to experience covid- like symptoms, and after she tested positive for Covid-19.

156.    Additionally, Defendant failed to provide reasonable accommodations to Plaintiff when approximately one week after Plaintiff's first request, Ms. Deal emailed the whole team that going forward the reasonable accommodation of telework would no longer be allowed, an obvious response to Plaintiff's request.

157.    Additionally, Defendant failed to provide reasonable accommodations to Plaintiff when they denied Plaintiff's formal request for a reasonable accommodation of telework on December 24, 2021, after testing positive for Covid-19.

158.    Defendant has no genuine basis to deny this reasonable accommodation to Plaintiff as Ms. Deal received telework for the week of the Thanksgiving holiday after reporting covid-like symptoms, and as the department had performed their jobs via telework for most of the past year due to the Covid-19 pandemic.

159.    This unlawful denial of a reasonable accommodation directly led to Plaintiff having to use her short-term disability leave.

160.    Defendant used this new disability status to harass, demean, degrade, and humiliate the Plaintiff.

161.    The Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

**COUNT VI**

**VIOLATION OF TITLE VII – RETALIATION**

162.    Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

163.    Within the first few months of Plaintiff's employment, she pushed back against the status quo of this workplace. On or around April 9, 2020, Plaintiff informed Ms. Deal that leave had been unlawfully taken from her, leave which should have been covered per UMMC policy. This obviously frustrated Ms. Deal as she did not respond to Plaintiff's email yet the leave was miraculously restored several weeks later.

164.    Likewise, approximately one week later, in retaliation, when Plaintiff sought out opportunities to work at the LBT, she was being denied and advised that she would need to contact Ms. Deal to change the decision. This coincides with the time in which Defendant began to intentionally remove Plaintiff from department emails.

165.    Once Plaintiff appealed to senior management, refusing to be denied opportunities under the pre-text of being part-time (despite White part-time employees being granted such opportunities), Ms. Deal was forced to allow Plaintiff to work at the LBT. This embarrassment of

being wrong publicly lead Ms. Deal to increase her retaliation for Plaintiff daring to challenge the clear racial hierarchy in place at UMMC.

166.    On one weekend, on or around April 2020, Plaintiff worked with a White employee who, over eleven months later, wrote a peer review based on their "work together." This stale peer review was used by Ms. Deal in her next iteration of retaliation, a fraudulent and fictious Performance Evaluation that failed to demonstrate her actual workplace accomplishments.

167.    In further reprisal, soon after complaining to her EEOC Representative of race discrimination and a hostile working environment when Plaintiff received the Performance Evaluation, Plaintiff was subjected to the unlawful conduct and adverse actions of her supervisor summarily placing her on a PIP plan days later.

168.    Finally, on December 6, 2021, Plaintiff requested a reasonable accommodation of telework for covid symptoms. Not only did Defendant deny her request, but one week later, December 13, 2021, Ms. Deal sent an email to the entire team that telework would no longer be permitted. This was done internationally to target Ms. White, who thanks to multiple denials or reasonable accommodations, was now without leave. Therefore, as she was no longer able to work remotely, she would be required to request unpaid leave should anything happened.

169.    UMMC must comply with Title VII, and by and through their conduct, violated the law.

170.    Defendant subjected Plaintiff to adverse employment actions because of her opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

171.    Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to them engaging in the aforementioned adverse actions.  Defendant's knowledge can be shown when they were informed by Plaintiff directly, advised by an EEOC representative, or otherwise should have known that Plaintiff engaged in the complaint process based on her

informal and formal complaint filings. The adverse retaliatory actions (denying accommodations, denying equitable working conditions and terms of employment to that of non-Black employees, subjecting to a frivolous PIP plan, and changing a leave policy immediately, in hope of forcing Plaintiff out) to which Plaintiff has been subjected to are a direct result of Plaintiff opposing the racial hierarchy in place and previously engaging in statutorily-protected activity.

172.    Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

173.    Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

174.    Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

175.    Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, creating a chilling effect in violation of Title VII.

176.    The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

177.    Defendant's unlawful conduct negatively impacted the terms, conditions, and privileges of Plaintiff's employment.

178.    Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her participation and opposition to Defendant's discriminatory conduct.

179.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

180.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

181.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

182.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

183.     Defendant is directly liable for the discriminatory acts or omissions of its employees while acting within the court and scope of their employment, under the theory of *Respondeat Superior*.

184.     Defendant's actions were intentional, reckless, and malicious.

185.     As a direct and proximate cause of Defendant's conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages— including but not limited to past and future loss of income, benefits, and career opportunities— and is entitled to all available legal and equitable remedies.

186.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering. Plaintiff's injury is permanent in nature. Further, Defendant's actions were ongoing.

187.     Plaintiff has incurred lost wages, loss of reputation, defamation of character now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## COUNT VII

### VIOLATION OF MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")

188.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

189.    The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

190.    Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) **or** directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.  Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

191.    Harassment is defined as unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

192.    When Defendant intentionally harassed Plaintiff due to her race, gender, disability or condition (pregnancy and Covid-19) subjected her to disparate treatment via different terms of employment and denying her multiple reasonable accommodation requests their conduct was in violation of the FEPA.

## COUNT VIII

## FAILURE TO PAY WAGES UNDER MARYLAND WAGE PAYMENT AND COLLECTION LAW ("MWPCL")

193.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

194.    Defendant was an employer of Plaintiff within the meaning of the MWPCL. Md. Code, Lab. & Empl. Art. Sec. 3-501(b).

195.    The MWPCL requires employers to pay an employee wage for all work performed. Md. Code, Lab. & Empl. Art. § 3-501. The "wages" required to be timely paid by the MWPCL include overtime wages and fringe benefits.

196.    Defendant violated the MWPCL by failing to timely pay Plaintiff after forcing her to come to work on her off-days to perform work tasks, such as participating in PIP meetings.

197.    Defendant's violations of the MWPCL were willful and knowingly, often denying Plaintiff's request for PIP meetings and similar tasks to be done on days she would be paid.

198.    For Defendant's violations of the MWPCL, Defendant is liable to Plaintiff for three times the amount of unpaid wages, court costs, reasonable attorney's fees and expenses, interest, and any other relief deemed appropriate by the Court.

## COUNT IX

## VIOLATION OF THE PREGNANCY DISCRIMINATION ACT OF 1978

199.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

200.    The Pregnancy Discrimination Act ("PDA") forbids discrimination based on pregnancy when it comes to any aspect of employment, including hiring, firing, pay, job assignments,

promotions, layoff, training, fringe benefits, such as leave and health insurance, and any other term or condition of employment.

201.    On June 17, 2021, Ms. White's OBGYN recommended that she telework due to pregnancy complications and her increasing stress. Defendant was aware of her pregnancy complications and her new disability status as Plaintiff immediately requested from Defendant a reasonable accommodation of telework.

202.    Defendant failed to provide reasonable accommodations to Plaintiff and failed to engage in the interactive process, when they denied her telework, and required her to use short-term disability leave.

203.    Additionally, Defendant failed to provide reasonable accommodations to Plaintiff when they subjected her to different clock-in/ clock-out requirements than non-pregnant employees.

204.    Defendant has no genuine basis to deny this reasonable accommodation as Plaintiff and the entire department performed their jobs via telework for most of the past year due to the Covid-19 pandemic. Further, Ms. Brokos (White, female, pregnant) has had the reasonable accommodation of telework due to pregnancy during this same period of time.

205.    This denial of a reasonable accommodation directly led to Plaintiff receiving and/or being threatened with disciplinary action known as an occurrence due to her request for an additional week to recover before returning to work.

206.    Defendant used this new disability status to harass, demean, degrade, and humiliate the Plaintiff.

207.    The Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

1. Award damages including but not limited to repayment to Plaintiff, out of pocket expenses, and ancillary expenses and costs;

2. Award compensatory damages in the amount of $500,000;

3. Enter a declaratory judgement finding that the foregoing actions of Defendant violated Maryland law;

4. Three times the amount of unpaid wages, pursuant to the MWPCL, Md. Code, Lab & Empl. Art., 3-507 (b);

5. Enter an amount equal to the tax on any award, interest, and costs;

6. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;

7. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

8. Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.


Dated: March 18, 2022                    Respectfully submitted,

                                         By: /s/ Dionna Maria Lewis
                                         Dionna Maria Lewis, Esq.
                                         (Bar No. 19486)

District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite 2098
Washington, D.C.20003
Tel. (202) 486-3478 |
Dionna@DistrictLegalGroup.com

*Counsel for Latoya White*